LEE CURTIS TATE,                          :

    Plaintiff,                       :

vs.                                       :    CIVIL ACTION 09-0268-WS-M

OFFICER ROCKFORD, et al.,                 :

    Defendants.                      :


## REPORT AND RECOMMENDATION

Plaintiff, an Alabama prison inmate proceeding pro se and in forma pauperis filed a Complaint under 42 U.S.C. § 1983. This action was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.2(c)(4), and is now before the undersigned on Defendants' Motion for Summary Judgment (Docs. 15, 16), and Plaintiff's Response and Argument thereto (Doc. 28). After consideration of these pleadings, and for the reasons set out below, it is recommended that Defendants' Motion for Summary Judgment be granted and that Plaintiff's action be dismissed with prejudice.

## I.  FACTS

From its review of the record, the Court summarizes the parties' allegations which are material to the issues addressed in this Report and Recommendation. On or about September 9, 2008, while incarcerated at Fountain Correctional Facility ("Fountain"), Plaintiff claims that he was beaten by Defendant Correctional Officer Kerry Rothchild. (Doc. 1 at 8). Specifically, Plaintiff states the following:

On or about the 9th day of September, 2008, Tate
was within the Fountain Correctional Centers Dorm
G wherein he encountered defendant Rockford.[1]
Tate requested of Rockford to be allowed to go to
the shift office in order to obtain his prison
identification card.  Rockford took his two arms
and pushed Tate in the chest and told him, nigger
that killer shit doesn't impress me (sic).  Tate
turned to place his radio down and Rockford with a
ball fist with a ring on one of his fingers, hit
Tate in the head and open a bleeding wound upon
his head (sic).  Tate was beaten and thrown to the
floor, handcuffed and taken to the shift office.

Defendant Lt. Lang[2] once in the shift office took
his shift office (sic) and was about to commence
beating Tate while handcuffed in the shift office.
Captain Shirley Smith came in and asked Lang why
did he have her shift office.  Lang told Captain
Smith repeatively (sic) that if you don't get that
nigger out of here I'm going to kill him.  Captain
Smith then ordered Lang to get out of the shift
office.  Smith then ordered Lang to get out of the
shift office.  Smith then told Rockford and other
John Doe defendant officer's [Does] (sic) to take
Tate to the infirmary.

On the way to the infirmary Lang was in the
hallway and told Rockford and Does (sic), y'all
know what to do.  Rockford and Does (sic) then
took the handcuffs and twisted them very hard
causing Tate severe pain and Tate attempted to
turn to complain.  He was pushed into the wall,
turned around and Rockford and one of the Doe's
took handcuffs that were held in his hand and beat
Tate up against his head causing open laceration
and blood pooring out of it (sic).

Captain Smith heard the beating and ran out to
stop it and was thrown to the floor by Rockford
and the Does (sic).  She got up and looked at
defendant Lt. Lang and asked him was he going to
do anything to help her stop the beating of Tate,
Lang just smiled (sic).  Lang stood their (sic)

---

[1]In his Complaint, Plaintiff incorrectly refers to Defendant
Correctional Officer Kerry Rothchild as "Rockford." (Doc. 1).

[2]In his Complaint, Plaintiff incorrectly refers to Defendant
Correctional Lieutenant Steven Lane as "Lang."  (Doc. 1).

2

> and would not intervene. Captain Smith after
> hollaring (sic) repeatively (sic) was finally able
> to stop the maliciously (sic) beating of Tate and
> have him taken to the infirmary where he was then
> immediately transported to the hospital.

(Doc. 1 at 8-9).

In Count II of his Complaint, Plaintiff alleges a denial of

due process by Defendant English, a correctional lieutenant at

Holman Correctional Facility ("Holman"). Specifically, Plaintiff

states the following:

> Plaintiff realleges Count I and avers the
> following. Tate was given a disciplinary by
> Rothchild for assault upon a correctional officer.
> Tate was denied procedure due process (sic) by
> defendant Lt. English who was the hereing (sic)
> officer. Tate upon being served the disciplinary
> report requested witness Captain Smith of the
> ADOC. When Tate was taken to the hearing he asked
> Lt. English [English] where was his witness. Lt.
> English told Tate to shut his damn mouth up he
> wasn't there to ask questions. Tate told English
> if you're not going to bring my witnesses here to
> the hearing you can railroad me without me being
> present. Take me back to my cell.

(Doc. 1 at 9-10).

On May 12, 2009, Plaintiff filed the present § 1983 action,

asserting an Eighth Amendment excessive force claim against

Defendants Correctional Officer Kerry Rothchild and Correctional

Lieutenant Steven Lane, and alleging a Fourteenth Amendment due

process violation against Defendant Correctional Lieutenant James

English.[3]  (Doc. 1).  In his Complaint, Plaintiff claims that

---

[3]In his Complaint, Plaintiff also names "John Doe -
Officer(s)" as Defendant(s) in this action.  (Doc. 1 at 5).  "As
a general matter, fictitious-party pleading is not permitted in
federal court."  Richardson v. Johnson, 598 F.3d 734, 738 (11th

Defendant Rothchild violated his Eighth Amendment rights by using excessive force against him during two altercations at Fountain on September 9, 2008, and further that Defendant Lane witnessed and failed to intervene in said altercations. (Id. at 5, 8-9). Plaintiff also complains that Defendant English, a lieutenant at Holman Correctional Facility, violated his due process rights when English, as the hearing officer, found Plaintiff guilty of a disciplinary related to the incident. (Id. at 5, 9-11). Plaintiff seeks compensatory damages in the amount of $75,000, punitive damages in the amount of $250,000, and an order vacating the disciplinary report from his record. (Id. at 10).

In their Answer filed on December 11, 2009, Defendants deny Plaintiff's allegations and assert the defenses of qualified, absolute, discretionary function, and state agent immunity. (Doc. 15). Additionally, Defendants have provided the Court extensive documentation of the records and reports generated in connection with the reporting of and investigation of the altercations which occurred on September 9, 2008. (Doc. 16, Exs. A-O).

---

Cir. 2010). "We have created a limited exception to this rule when plaintiff's description of the defendant is so specific as to be 'at the very worst, surplusage.'" (Id.). In Plaintiff's Response to Defendants' Motion for Summary Judgment, Plaintiff identifies Correctional Officers Travis Brown, Corey Sykes, Timothy McCorvey, and Antywon Madison as additional defendants, presumably the "John Doe officers" referenced in Plaintiff's Complaint. The determination of whether or not to allow substitution of these officers into this lawsuit is not necessary, however, as this Court has determined that Plaintiff has failed to show a constitutional violation.

Defendant Correctional Officer Kerry Rothchild avers that on September 9, 2008, as he was in the process of locking down the G-block at Fountain at approximately 6 p.m., he was approached aggressively by Plaintiff who stated that he needed to leave to get his I.D. from Lieutenant Lane. (Doc. 16, Ex. 1 at 1-2). In response, Defendant Rothchild ordered Plaintiff to remain in G-block and advised Plaintiff that he would contact Lieutenant Lane regarding the I.D. (Id. at 2). When Plaintiff stepped forward, Defendant Rothchild extended his right arm and ordered Plaintiff to step away from the grill gate. (Id.). However, Plaintiff refused to step away, instead warning Officer Rothchild, "if you touch me, I'm gonna fire your ass up." (Id.). According to Defendant Rothchild, Plaintiff then slapped down Defendant Rothchild's hand. (Id.).

Meanwhile, according to Defendant Rothchild, an unidentified inmate grabbed Plaintiff, advising Plaintiff that "you don't want to do that." (Id.). However, Plaintiff "continued to be loud and belligerent, yelling 'I'll kill your bitch ass.'" (Id.). Plaintiff continued to threaten to kill Officer Rothchild, and also stated "when I put this knife in your ass."[4] (Id.). Defendant Rothchild avers that he gave Plaintiff a loud verbal order to be quiet and not to disrespect him. (Id.). Defendant

---

[4]The Court notes that the inmate assisting Plaintiff in this litigation has stated under oath that Plaintiff "has a quick and violent temper based upon his low IQ, illiteracy, indigent status, and when he's unable to understand things." (Doc. 20 at 4).

Officer Rothchild states that Plaintiff then threw down his radio and began to throw a punch at Rothchild. (Id. at 3). At this point, Defendant Rothchild claims that he was forced to defend himself by counter striking Plaintiff, who then fell to the ground, pulling Rothchild on top of him. (Id.). In the process, Plaintiff pulled off Officer Rothchild's radio and all of the buttons from his uniform shirt. (Id.).

Officer Rothchild avers that he tried to hold Plaintiff on the floor until backup arrived, and that Plaintiff became even more aggressive, screaming "I'm going to kill you bitch," while beginning to get up and wrestle with Defendant Rothchild. (Id.). While fearing for his life and safety, Defendant Rothchild picked Plaintiff up and attempted to break away from his grasp, but both he and Plaintiff fell. (Id.). Subsequently, two unidentified inmates pulled Defendant Rothchild from Plaintiff's grasp, pushing the officer out of G-block. (Id.). Once out of G-block, Officer Rothchild states that he walked to the shift office to report the incident. (Id.).

According to Officer Rothchild, approximately two minutes after arriving at the shift office, Correctional Officer Timothy McCorvey escorted Plaintiff into the shift office. As Plaintiff entered the office, he began threatening to kill Rothchild, and "anyone in blue." (Id.). Subsequently, Correctional Captain Shirley Smith entered the shift office, ordering Plaintiff to be quiet and ordering Defendant Rothchild to stand at the back of the shift office. (Id. at 3-4). Defendant Rothchild complied

with the order, but Plaintiff continued to be aggressively loud and disruptive, shouting threats toward Rothchild and anyone associated with ADOC security. (Id. at 4). Captain Smith was unable to interview Plaintiff, as he continued to be loud and disruptive.

Rothchild states that Captain Smith next ordered Officer McCorvey to escort Plaintiff to Fountain's Healthcare Unit to receive medical treatment. (Id.). However, as Officer McCorvey began to escort Plaintiff to the Healthcare Unit, Plaintiff "snatched away" from Officer McCorvey in an aggressive manner. (Id.). Defendant Officer Rothchild avers that he and Captain Smith exited the shift office in an attempt to assist Officer McCorvey. (Id.). Officer Rothchild says that he observed Plaintiff grab the legs of Captain Smith, knocking her to the floor. Plaintiff then began to rise up as if to charge at Captain Smith who was still on the floor, and Rothchild states that he, in an attempt to stop Plaintiff's forward progress, attempted to kick Plaintiff. (Id.). Subsequently, at approximately 6:12 p.m., Lieutenant Lane escorted Plaintiff to the Healthcare Unit. (Id.). Officer Rothchild avers that Plaintiff was never handcuffed in his presence.

According to Captain Shirley Smith, on the date in question, at 5:50 p.m., she instructed all security officers to begin locking down Fountain because of bad weather. (Doc. 16, Ex. D). Captain Smith states that she became aware of a problem and then observed Officer McCorvey restraining Plaintiff on the main hall

7

in front of G-dorm. (Id. at 2). Captain Smith reported to the shift office and observed Plaintiff and Officer Rothchild yelling obscenities at each other, and threatening bodily harm to each other. (Id. at 2-3).

As Plaintiff began telling Captain Smith his version of the incident, he referred to the officers as "these motherfuckers," and Captain Smith ordered Plaintiff to cease name calling and the use of profanity. (Id. at 3). Officer Rothchild jumped from his chair, and attempted to come forward, but Captain Smith ordered him back. (Id.). Captain Smith recalls that Officer Travis Brown grabbed Plaintiff around the neck, and Captain Smith pulled him away from Plaintiff. (Id.). Officer Rothchild wanted Plaintiff taken away from him. (Id.).

Another inmate then approached Captain Smith, handing her the security keys to G-dorm, which had apparently been dislodged from Officer Rothchild's uniform during the altercation. (Id.). Smith then immediately left the office and secured G-dorm. (Id.). When Captain Smith returned to the shift office, she instructed Officer McCorvey to escort Plaintiff to the Healthcare Unit for a medical assessment, and that for security reasons, Plaintiff was escorted onto the main hall un-cuffed, due to the main hall being populated with other inmates. (Id. at 4).

From the shift office, Captain Smith states that she observed Plaintiff, while being escorted along the main hall to the Healthcare Unit, pull away from Officer McCorvey's grasp. (Id.). According to Smith, Officer McCorvey pinned Plaintiff

against the wall, and she ran to assist in restraining Plaintiff by attempting to take him to the floor. (Id.). Captain Smith was then hit from the rear and knocked to the floor by several officers who came to assist, hurting her arm when she fell. (Id.). Captain Smith states that she observed Officers McCorvey, Madison, Brown and Rothchild hitting Plaintiff with closed fists, and that she attempted to get up but was knocked to the floor again, as Plaintiff and the officers fell to the ground. (Id.). Captain Smith observed Officer Rothchild kick at Plaintiff with his right leg, but does not know whether Rothchild made contact with anyone. She states that Officer Rothchild fell to the ground. (Id.).

Captain Smith avers that she yelled for the officers to stop fighting with Plaintiff, as Plaintiff had stopped resisting, but they did not immediately comply with her order. (Id. at 5). Captain Smith called for Lieutenant Steven Lane and Officer Garyon Johnson to assist on the main hall. (Id.). She also directed an officer to notify the wardens and captains of the need to report to the institution. (Id.). Plaintiff was then escorted by Lieutenant Lane and Officer James Murphy to the Healthcare Unit for a medical assessment. (Id.). Captain Smith attempted to interview Plaintiff in the Healthcare Unit, but he refused to speak to her, only wanting to speak to the Warden. (Id.). Captain Smith was injured during this altercation, and was transported by Warden Folks to Atmore Community Hospital, where she was treated and released. (Id.).

Correctional Officer Timothy McCorvey has averred that on September 9, 2008, he detained Plaintiff and escorted him to the shift office. (Doc. 16, Ex. G at 2). Once in the shift office, he and Captain Smith attempted to calm Plaintiff and Officer Rothchild, who were exchanging words. (Id.). Officer McCorvey began escorting Plaintiff, without handcuffs, to the Healthcare Unit as instructed by Captain Smith, but as they were walking, Plaintiff "snatched away" from his grasp and stated, "I'm was tired of this shit, I'm going to start killing y'all motherfuckers." (Id. at 2, 3). According to Officer McCorvey, as he attempted to calm Plaintiff, Plaintiff proceeded to become more violent, pushing against Officer McCorvey. (Id. at 2).

Officer McCorvey avers that he tried to restrain Plaintiff by forcing him to the floor, and that he held Plaintiff against the floor until he "felt that the safety of his life was out of harm's way." (Id.). Officer McCorvey states that he was hit with a closed fist in the face and chest area several times by Plaintiff, and further states that he hit Plaintiff back several times, while trying to defend himself. (Id. at 3).

According to Lieutenant Steven Lane, his first involvement in this incident occurred when he entered the shift office and observed Officer Rothchild's shirt on the table, Officer Rothchild standing in the back of the office, and Plaintiff being restrained in the office. (Doc. 16, Ex. B at 2). Officer Rothchild advised Lieutenant Lane that Plaintiff had ripped Rothchild's shirt off of him. (Id.). At this time, Captain Shirley Smith was questioning Plaintiff, and Lieutenant Lane

noticed that the hallway was becoming more congested with inmates.  (Id.).  Lane left the shift office and began instructing all inmates to report to their assigned dormitories. (Id.).

As Lieutenant Lane was attempting to clear the area of inmates, he turned and looked back down the hall and observed Officer McCorvey with both hands around Plaintiff's neck, pushing Plaintiff against the wall.  (Id.).  Lane avers that he ran down the hall, instructing McCorvey to let Plaintiff go.  (Id.). Despite his instruction, as well as the instruction of Captain Smith, Officer McCorvey did not release his grasp on Plaintiff. (Id. at 2-3).  Lieutenant Lane states that he approached Officer McCorvey and grabbed him around the upper chest area, yelling for him to let go of Plaintiff.  (Id. at 3).  According to Lane, Officer McCorvey did not release his grasp on Plaintiff.  Lane saw Captain Smith fall to the floor.  (Id.).  Another officer, Correctional Officer Murphy was pulling Plaintiff in the opposite direction, and they all fell to the floor on top of Officer McCorvey's back, including Lieutenant Lane.  (Id.).  Lane was able to break Officer McCorvey's grasp from Plaintiff, and continued to restrain McCorvey when Officer Travis Brown began hitting Plaintiff.  (Id.).  Plaintiff was punching and kicking upwards.  (Id.).

Lieutenant Lane states that he released Officer McCorvey when he saw Officer Rothchild attempt to kick Plaintiff, and Lane instructed Officer Madison to restrain Officer Rothchild.  (Id.). Subsequently, Lane avers that he escorted Plaintiff to the

11

Healthcare Unit, without handcuffs, and without any further
incident.  (Id.).  According to Lieutenant Lane, Plaintiff was
handcuffed in the lobby of the Healthcare Unit.  (Id. at 4).
Lane then had Officer Garyon Johnson bring the evidence camera to
photograph Plaintiff prior to the medical staff cleaning his
injuries.  (Id.).

According to Lane, Plaintiff was very upset in the
examination room, stating, "I'm gonna kill all of you hoes as
soon as I get a chance.  You better keep me in lock up until I
leave this bitch.  Y'all are gonna pay for this shit.  On my
Momma, I'm gonna kill one of you hoes."  (Id.).  Looking directly
at Lieutenant Lane, Plaintiff stated, "[y]ou set me up.  I
thought you was a man, you weak bitch.  You stood around and let
them hoes kludge me out.  That's some weak shit.  You gonna pay
for that shit on my Momma, I'm going to get everyone of them weak
bitches that put their hands on me."  (Id.).  When advised to
calm down, Plaintiff responded, "[f]uck calm down, I'm gonna kill
one of you hoes!"  (Id.).  At that point, the examination camera
arrived, and photographs of Plaintiff's injuries were taken.
When asked if the nursing staff could go ahead with his medical
assessment, Plaintiff responded, "[t]hem nurses ain't done
nothing to me.  I'm not gonna hurt them.  It's y'all mother
fucking ass that gonna get it.  Just as soon as I get a chance,
I'm gonna kill one of you hoes."  (Id.).

Lieutenant Lane avers that Officer McCorvey walked into the
Healthcare Unit, but was advised to leave, as Lane had enough
officers in the unit.  (Id. at 5).  As McCorvey turned to leave,

Plaintiff yelled, "[a]ll you weak bitches are going to pay.  I'm
gonna kill all your mammies when I get out."  When Officer
McCorvey yelled from the hallway for Plaintiff to shut up and
that Plaintiff "ain't gonna do nothing but talk," Plaintiff
replied, "[t]hat was some weak shit, Goldmouth, you gonna pay for
that shit."  (Id.).

Lane states that he and Officer Murphy remained with
Plaintiff in the examination room, until instructed by Warden
Ferrell to step out.  (Id. at 6).  Lane advised Plaintiff to calm
down so that the nurses could assess him.  However, when Nurse
Turberville placed a thermometer in his mouth, Plaintiff grabbed
it and slammed it on the floor, smashing it to pieces.  (Id.).
Lieutenant Lane instructed the medical staff to leave the room,
advising Plaintiff that he would not get treatment if he could
not calm down.  (Id. at 7).  After the nursing staff concluded
their examination, Plaintiff was transported to Atmore Community
Hospital for further examination.  Upon his return from the
hospital, Plaintiff's property, medical file and institutional
file was placed on a van and transferred along with Plaintiff to
Holman Correctional Facility.  (Id.).

Additional information submitted by Defendants include the
affidavit of Correctional Officer Wesley Murphy who avers that he
witnessed Lieutenant Lane pulling Officer McCorvey by the chest,
attempting to pull McCorvey and Plaintiff apart.  (Doc. 16, Ex. H
at 2).  Officer Murphy states that he attempted to restrain
Plaintiff by grabbing him around his upper torso, and giving
Plaintiff several loud and clear verbal orders to stop resisting.

13

(Id.).  However, according to Officer Murphy, Plaintiff continued to resist.  (Id.).  Murphy says that he released his grasp on Plaintiff as Plaintiff fell to the floor, but he then held Plaintiff down to try and stop Plaintiff from fighting and resisting.  (Id.).  Officer Murphy states that he released Plaintiff when he heard Lieutenant Lane order him to do so.  (Id.).  Murphy then accompanied Lane in escorting Plaintiff to the Healthcare Unit.  (Id.).

Prison records reflect that Plaintiff was examined in the Healthcare Unit on September 9, 2008, at approximately 6:10 p.m., just moments following the incident.  (Doc. 16, Ex. K at 16).  The medical record reflects that Plaintiff reported that he wanted to get his ID from Lieutenant Lane and that an officer had pushed him.  (Id.).  Plaintiff advised medical personnel that he told the officer that "he better get the 'fxxx' out of my face & he pushed me & I fell into the bed - Thats how I cut my eye."  (Id.).  Plaintiff also explained that he and the officer started wrestling, that he was then taken to the shift office, and that the officers jumped on him.  (Id.).

The medical record also indicates that Plaintiff was screaming at the nurses and officers.  (Id.).  It was noted that Plaintiff had a one inch laceration over his right eye, a one-fourth inch laceration on the left side of his forehead, small abrasions on his knees, a small cut in his left ear, a small cut behind his left ear, and a small cut in the corner of his right eye.  A large swollen area was also observed under Plaintiff's right eye.  (Id.).  Plaintiff denied any loss of consciousness.

14

(<u>Id.</u>).  The medical staff cleaned Plaintiff's wounds, and applied steri-strips to two of the lacerations.  (<u>Id.</u>).

Progress Notes prepared by two nurses involved in Plaintiff's medical treatment following the altercation reflect Plaintiff's use of profanity and numerous threats to kill the officers.  (Doc. 16, Ex. M at 1-2).  According to the records, when the nurses attempted to obtain Plaintiff's vital signs, he broke the thermometer by throwing it to the ground.  (<u>Id.</u>).  When finally able to perform their assessment on Plaintiff, they cleaned his wounds and administered Motrin 600mg to help with swelling and pain.  (<u>Id.</u>).  Plaintiff was then transferred to the ER at Atmore Community Hospital by Warden Ferrell, where examinations, tests and x-rays revealed Plaintiff had suffered no additional injuries or broken bones.  (<u>Id.</u> at 3-16).

Body chart reports were also prepared for each officer involved in the altercation, with Officer Murphy, Officer Brown, and Lieutenant Lane reporting no injuries.  (Doc. 16, Ex. K at 19-26).  Officer Rothchild's record reflects a right hand injury, a swollen right knee, and complaints of hand, back and knee pain.  (<u>Id.</u> at 24).  Officers Madison and Sykes reported neck and back pain, respectively, and Officer McCorvey was experiencing pain in his hand, as well as an abrasion on his right knee.  (<u>Id.</u> at 20-22).

Defendants have also submitted a copy of the official incident report, including statements made at the time by Defendants Rothchild and Lane, as well as the additional officers involved in the altercation.  (<u>Id.</u> at 1-15).  Additionally, a

copy of the disciplinary report charging Plaintiff with "Assault on DOC" has been filed with the Court, reflecting the violation that Plaintiff was charged, as well as details regarding the hearing. (Doc. 16, Ex. L at 1-7). Plaintiff was found guilty of the violation, and ordered to 45 days of disciplinary segregation, as well as 45 days loss of store, phone, and visitation privileges. (Id. at 2).

A full investigation into the facts of the altercations with Plaintiff on September 9, 2008, was conducted by the Investigation and Intelligence Division of the Alabama Department of Corrections, with the investigator, Donnie Nunley, determining that Officer Kerry Rothchild "did not use reasonable, necessary, physical force." (Doc. 16, Ex. N at 1). As a result of the investigation, Correctional Officer Kerry Rothchild was charged with violating ADOC Administrative Regulation 208, Employee Standards of Conduct and Discipline.[5] (Id. at 14).

An administrative hearing was held on June 2, 2009, in the Warden's Office at Fountain. (Id. at 13). Correctional Officer Kerry Rothchild was found guilty as to certain violations and not guilty as to others. Specifically, the hearing officer determined that Officer Rothchild was guilty of failing to render full, efficient, and industrious service; failing to respond

---

[5]Specifically, Officer Rothchild was charged with "Failure to follow supervisor's instructions; non-compliance with policies and procedures – 1st offense;" "Serious violations of rules, policies, procedures, regulations, laws, or reasonable conduct expectations – 1st offense;" "Abusive or misuse of authority – 1st offense;" "Abusive or excessive physical force in dealing with inmates – 1st offense." (Doc. 16, Ex. N at 14).

16

promptly to directions and instructions of supervisor; failing to observe all laws, rules and regulations; and failing to conduct himself in a manner consistent with the maintenance of proper security and welfare of the institution and of inmates under his supervision.[6]  (Id. at 19-21).

However, notably, as to the charge of using unnecessary physical force, Officer Rothchild was found not guilty.[7]  (Id. at 20).  According to the hearing officer, "[t]he use of force in the dorm was reasonable to quell a disturbance and the officer was alone in the cell."  (Id.).  Furthermore, it was determined that "[b]ased upon the incident report, investigative report, and testimony, none of the witnesses testified that Officer Rothchild actually hit or kicked Inmate Tate during the 2nd altercation in the hall."  (Id.).

On January 19, 2010, the Court ordered that Defendants' Answer and Special Report be treated as a Motion for Summary Judgment.  (Doc. 19).  On January 21, 2010, Plaintiff filed a

---

[6]In making these determinations, the hearing officer noted that Officer Rothchild could have avoided an escalation in violence by locking the cell gate and requesting assistance via radio once he realized that Plaintiff was verbally threatening and abusive toward authority.  (Doc. 16, Ex. N at 19).  It was also noted that Officer Rothchild did not comply with the instructions of his supervisor, and that he should not have engaged in physical force in the dorm alone.  (Id. at 20).  Additionally, the hearing officer found that Officer Rothchild admitted that he left the shift office after being told to remain there by Captain Smith.  (Id.).

[7]Officer Rothchild was also found not guilty as to the charges of abuse of authority attached to the use of a badge, and failing to cooperate with investigations.  (Doc. 16, Ex. N at 20).

Motion to Appoint Counsel (Doc. 20), which was denied by this
Court on February 1, 2010.  (Doc. 21).  In the Motion to Appoint
Counsel, fellow inmate James McConico, Jr., identifies himself as
the drafter of the pleadings in this action.  (Doc. 20 at 2).
Inmate McConico also submits a "Declaration" of his own in which
he states the following:

> I have communicated with Tate.  He has a quick and
> violent temper based upon his low IQ, illiteracy,
> indigent status and when he's unable to understand
> things.  This has led to numerous arguments, which I
> can no longer assist or subject myself to belittlement
> by Tate.

(Id. at 4).  McConico signed this Declaration "under penalty of
perjury."  (Id.).

On February 26, 2010, Plaintiff appealed to United States
District Judge William H. Steele, who affirmed the denial of
Plaintiff's Motion to Appoint Counsel on March 2, 2010.  (Docs.
24, 25).  Plaintiff filed his Response and Argument to
Defendants' Motion for Summary Judgment on March 25, 2010.  (Doc.
28).  In his response, Plaintiff reaffirms his claims of Eighth
Amendment excessive force and due process against Defendants, and
identifies Correctional Officers Travis Brown, Corey Sykes,
Timothy McCorvey, and Antywon Madison as additional Defendants.
(Doc. 28).

## II. SUMMARY JUDGMENT STANDARD

In analyzing the propriety of a motion for summary judgment,
the Court begins with these basic principles.  The Federal Rules
of Civil Procedure grant this Court authority under Rule 56 to
render "judgment as a matter of law" to a party who moves for

summary judgment.  "[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact. . . .'" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).

The Court must view the evidence produced by "the nonmoving party, and all factual inferences arising from it, in the light most favorable to" that party.  Barfield v. Brierton, 883 F.2d 923, 934 (11th Cir. 1989).  However, the Court is only to "make all *reasonable* inferences in favor of the party opposing summary judgment...not to make all *possible* inferences in the nonmoving party's favor."  Torjagbo v. United States, 285 Fed. Appx. 615, 619 (11th Cir. 2008) (emphasis in original).

Rule 56(e)(2) states that:

> [w]hen a motion for summary judgment is
> properly made and supported, an opposing
> party may not rely merely on allegations or
> denials in its own pleading; rather, its
> response must-by affidavits or as otherwise
> provided in this rule-set out specific facts
> showing a genuine issue for trial.  If the
> opposing party does not so respond, summary
> judgment should, if appropriate, be entered
> against that party.

Fed. R. Civ. P. 56(e).

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. . . .  If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477

19

U.S. 242, 249-50 (1986) (internal citations omitted). "Summary judgment is mandated where a party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc., 508 F.3d 641, 647 (11th Cir. 2007) (citations omitted).

In civil actions filed by inmates, although drawing "all justifiable inferences in [the inmate's] favor," federal courts

> must distinguish between evidence of disputed
> facts and disputed matters of professional
> judgment.  In respect to the latter, our
> inferences must accord deference to the views
> of prison authorities.  Unless a prisoner can
> point to sufficient evidence regarding such
> issues of judgment to allow him to prevail on
> the merits, he cannot prevail at the summary
> judgment stage.

Beard v. Banks, 548 U.S. 521, 529-30 (2006) (internal citation omitted).  "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is "no genuine issue for trial."'" Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

### III. DISCUSSION

As discussed above, Plaintiff seeks redress pursuant to 42 U.S.C. § 1983 for alleged constitutional deprivations arising from a physical altercation between himself and Officer Kerry Rothchild that occurred on September 9, 2008, in the G Dorm at Fountain, another altercation involving numerous officers in the hallway leading to the Healthcare Unit, and a corresponding

disciplinary charge for which Plaintiff was found guilty for
assaulting an officer. (Doc. 1). Plaintiff claims that
Correctional Officer Kerry Rothchild, and other officers, used
excessive force in restraining him and beating him. (Doc. 1 at
8-10). Defendants deny the use of excessive force and assert the
defenses of absolute, discretionary function, state agent, and
qualified immunity.[8]

Section 1983 provides in pertinent part that:

> Every person who, under color of any statute,
> ordinance, regulation, custom, or usage, of
> any State or Territory or the District of
> Columbia, subjects, or causes to be
> subjected, any citizen of the United States
> or other person within the jurisdiction
> thereof to the deprivation of any rights,
> privileges, or immunities secured by the
> Constitution and laws, shall be liable to the

---

[8]Plaintiff does not state whether he is asserting his Eighth
Amendment claim against Defendants in their official or
individual capacities, or both. As state officers, Defendants
are entitled to absolute immunity from suit for damages in their
official capacity. See Harbert Int'l, Inc. v. James, 157 F.3d
1271, 1277 (11th Cir. 1998) (state officials sued in their
official capacities are protected from suit for damages under the
Eleventh Amendment).

However, in Skrtich v. Thornton, 280 F.3d 1295, 1301 (11th
Cir. 2002), the Eleventh Circuit held that the defense of
qualified immunity is unavailable in a case such as this,
stating: "a defense of qualified immunity is not available in
cases alleging excessive force in violation of the Eighth
Amendment, because the use of force 'maliciously and sadistically
to cause harm' is clearly established to be a violation of the
Constitution. . . ." See also Johnson v. Breeden, 280 F.3d 1308,
1321 (11th Cir. 2002) ("[I]t is clearly established that all
infliction of excessive force on a prisoner sadistically and
maliciously for the very purpose of causing harm and which does
cause harm violates the Cruel and Unusual Punishment Clause. So,
where this type of constitutional violation is established there
is no room for qualified immunity."). The only question, then,
is whether Plaintiff has alleged facts sufficient to survive a
motion for summary judgment. "If he has done so, that is the end
of the inquiry." Skrtich, 280 F.3d at 1301.

> party injured in an action at law, suit in
> equity, or other proper proceeding for
> redress. . . .

42 U.S.C. § 1983 (1994).

In addressing Plaintiff's claims brought under §1983, the Court begins its analysis "by identifying the specific constitutional right allegedly infringed...." Graham v. Connor, 490 U.S. 386, 394 (1989). Plaintiff claims that he has suffered a violation of his Eighth Amendment right to be protected from cruel and unusual punishment, as well as a violation of his right to due process of law.

A. Excessive Force

The Eighth Amendment, which attaches "after conviction and sentence," protects incarcerated prisoners, like Plaintiff, from punishment that is "cruel and unusual." Graham, 490 U.S. at 392 n.6, 394. Specifically, the Eighth Amendment "prohibits the unnecessary and wanton infliction of pain, . . . the infliction of pain totally without penological justification. . . , [and] the infliction of punishment grossly disproportionate to the severity of the offense." Ort v. White, 813 F.2d 318, 321 (11th Cir. 1987) (citing Rhodes v. Chapman, 452 U.S. 337, 346 (1981)).

In order to establish an Eighth Amendment claim against Defendants, Plaintiff must prove both an objective and subjective component. That is, Plaintiff must show that the alleged wrongdoing was objectively "harmful enough" to establish a constitutional violation and that Defendants "act[ed] with a sufficiently culpable state of mind," i.e., that they acted "maliciously and sadistically to cause harm." Hudson v.

22

<u>McMillian</u>, 503 U.S. 1, 7-8 (1992).

In <u>Hudson</u>, the Supreme Court recognized that, whenever guards use force to keep order, they "must balance the need 'to maintain or restore discipline' through force against the risk of injury to inmates." <u>Hudson</u>, 503 U.S. at 6 (quoting <u>Whitley v. Albers</u>, 475 U.S. 312, 321-22 (1986)). Thus, "the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." <u>Id.</u> at 7. In making this determination, the Court considers the following factors:

> a) the need for the application of force; b) the relationship between the need and the amount of force that was used; c) the extent of the injury inflicted upon the prisoner; d) the extent of the threat to the safety of staff and inmates; and (e) any efforts made to temper the severity of a forceful response.

<u>Fennell v. Gilstrap</u>, 559 F.3d 1212, 1217 (11th Cir. 2009) (citing <u>Cockrell v. Sparks</u>, 510 F.3d 1307, 1311 (11th Cir. 2007). "When considering these factors, we 'give a wide range of deference to prison officials acting to preserve discipline and security, including when considering decisions made at the scene of a disturbance.'" <u>Fennell</u>, 559 F.3d at 1217 (quoting <u>Cockrell</u>, 510 F.3d at 1311) (internal quotation marks, alterations, and citation omitted). "We examine the facts as reasonably perceived by [the officer] on the basis of the facts known to him at the time." <u>Id.</u> (citing <u>Whitley v. Albers</u>, 475 U.S. 312, 321 (1986).

Considering the evidence in the light most favorable to

Plaintiff, the question is whether a jury could reasonably conclude that Defendants violated Plaintiff's rights under the Eighth Amendment. Under the circumstances of this case, Plaintiff's allegations fail to establish a constitutional violation.

     1.   <u>G-Dorm Altercation</u>

It is undisputed that Plaintiff and Correctional Officer Kerry Rothchild were involved in a physical altercation in Fountain's G-Dorm, which Officer Rothchild was attempting to lock down on September 9, 2008. (Doc. 1, Doc. 16, Ex. A, Doc. 28 at 15). It is further undisputed that the physical confrontation between Officer Rothchild and Plaintiff occurred in G-Dorm, with Officer Rothchild being the only officer in the area filled with inmates. (Doc. 16, Doc. 28). Plaintiff admits that he approached Officer Rothchild "about going to get [his] I.D. card," and claims that Officer Rothchild "start to pushed me." (Doc. 28 at 15). Plaintiff also acknowledges "[t]hats when I pushed his hand back." (<u>Id.</u>). Subsequently, a struggle between the two ensued which the evidence reflects resulted in Officer Rothchild's uniform shirt being ripped, as well the loss of Rothchild's radio and security keys for G-Dorm. (Doc. 16, Ex. A). It was only later that an unidentified inmate returned the keys to Captain Smith in the shift office. (<u>Id.</u>, Doc. 16, Ex. D).

Although Plaintiff only acknowledges "pushing" Officer Rothchild's hand, the evidence clearly reflects that Officer Rothchild's uniform shirt was torn, bloodied, and that his radio

and security keys were stripped from his body.  (Doc. 16, Exs. A,
B, D, G, Doc. 28).  Officer Rothchild has averred that during the
confrontation with Plaintiff, Plaintiff was aggressively yelling
threats that he would kill Rothchild.  (Doc. 16, Ex. A).  That
Plaintiff was yelling obscenities and threats throughout the
evening of September 9, 2008, is verified by numerous witnesses
including other officers and the nurses in the Healthcare Unit.
(Doc. 16, Exs. B, D, G, M).  The physical altercation ended when
Officer Rothchild was pushed out of G-Dorm by another inmate, and
Rothchild walked directly to the shift office.  (Doc. 16, Ex. A).

       The Court notes that ADOC investigator Donnie Nunley
concluded that Correctional Officer Rothchild "did not use
reasonable, necessary, physical force."  (Doc. 16, Ex. N at 1,
10).  However, following an administrative hearing which included
testimony from Mr. Nunley, Captain Shirley Smith, Lieutenant
Steven Lane, Officer Rothchild, as well as other officers,  it
was determined that Rothchild had not used excessive force
against Plaintiff.  (Id. at 20-21).

       While the determination of the Alabama Department of
Corrections or even the opinion of its investigator may be a
consideration in determining whether Defendant Rothchild's
actions were in violation of the Eighth Amendment, it does not
answer the question.  In Fennell v. Gilstrap, 559 F.3d 1212 (11th
Cir. 2009), the Eleventh Circuit held that a plaintiff failed to
show that a jailer's use of force violated the Fourteenth
Amendment, despite the fact that the Bartow County Sheriff's

Office, "after an internal investigation, concluded that [the jailer's] use of force was both excessive and unnecessary." Id. at 1217. The Court noted that the conclusion of the sheriff's office, "even if correct, does not answer the question of whether [the jailer] maliciously and sadistically used force to cause [plaintiff] harm, and thus violated [plaintiff's] Fourteenth Amendment rights." Id.

To determine whether there has been a constitutional violation, the Court must assess the factors enumerated above, just as the Eleventh Circuit did in Fennell. In assessing these factors, specifically, the threat reasonably perceived by Defendant Rothchild, the need for the use of force, and the extent of the injury to Plaintiff, it is evident that the disruptive behavior of Plaintiff created a chaotic and dangerous situation which undermined the authority and control of Officer Rothchild, and placed Officer Rothchild, as well as the other inmates, in danger.

The Plaintiff himself admits that he was seeking to leave the dorm to retrieve his prison I.D., and also that he pushed Officer Rothchild's hand. (Doc. 28 at 15). Moreover, the evidence in the record reflects that a violent altercation occurred, resulting in Officer Rothchild's shirt being torn and his security keys being stripped from his body. (Doc. 16, Ex. A). Clearly, this altercation, occurring in the dorm in the presence of numerous other inmates, created a dangerous situation for not only Officer Rothchild, but also for the other inmates,

correctional officers, and even Plaintiff himself.  Furthermore,
there has been no indication that Defendant Rothchild's motive in
attempting to restrain Plaintiff was anything other than a good
faith effort to end Plaintiff's disruptive and violent outburst
and restore discipline and control.

With respect to the amount of force used by Defendant
Rothchild, the Court is mindful that, while an inmate must be
protected from the "'unnecessary and wanton infliction of pain'
by prison officials," prison officials must maintain order and
discipline "in an often dangerous and unruly environment."  Ort
v. White, 813 F.2d 318, 321-22 (11th Cir. 1987).  Thus, prison
officials must be extended deference "in acting to insure the
proper administration, safety and security of a penal
institution."  Id. at 322.

"'The infliction of pain in the course of a prison security
measure, therefore, does not amount to cruel and unusual
punishment simply because it may appear in retrospect that the
degree of force authorized or applied for security purposes was
unreasonable, and hence unnecessary in the strict sense.'"  Id. at
323 (citations omitted).  Additionally, the Court "examine(s) the
facts as reasonably perceived by [Rothchild] on the basis of the
facts known to him at the time."  Fennell, 559 F.3d at 1217.

With these considerations in mind, the Court finds that the
force used by Defendant Rothchild in attempting to restrain
Plaintiff was applied for the purpose of restoring order and was
not, in any event, excessive.  Defendant's restraint of Plaintiff

27

ended a threatening situation, which as the Court has noted, was a danger not only to Officer Rothchild, but also to the other correctional officers, inmates, and Plaintiff himself. Moreover, following his restraint, the record clearly reflects that Plaintiff was escorted straight to the Healthcare Unit, where he was provided medical treatment. (Doc. 16, Exs. K, M).

Considering the extent of injury suffered, the Court is mindful that inherent in the protection afforded by the Eighth Amendment is the principle that "not 'every malevolent touch by a prison guard gives rise to a federal cause of action.'" Clark v. Johnson, 2000 WL 1568337, *12 (S.D. Ala. 2000) (unpublished)[9] (quoting Hudson, 503 U.S. at 9-10). Indeed, "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.'" Hudson, 503 U.S. at 9 (citations omitted).

The objective component of an Eighth Amendment excessive force claim "necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" Hudson, 503 U.S. at 9-10 (quoting Whitley v. Albers, 475 U.S. 312, 327 (1986)).

While the Supreme Court in Hudson did not define "de minimis

---

[9]"Pursuant to Eleventh Circuit Rule 36-2, unpublished opinions are not considered binding precedent, but may be cited as persuasive authority." Lanier Constr., Inc. v. Carbone Props. of Mobile, LLC, 253 Fed. Appx. 861, 865, 2007 WL 3307384, *3 (11th Cir. 2007).

use of force," it did hold that neither "serious" nor "significant" injury is required to satisfy the objective component of an Eighth Amendment claim, nor is any arbitrary quantum of injury an absolute requirement of an excessive force claim, apparently out of concerns that certain forms of torture are capable of inflicting extreme pain without leaving any mark or tangible injury. Id. at 9. ("Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.").

Recently, the Supreme Court noted that "injury and force...are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." Wilkins v. Gaddy, __ U.S. __, 130 S. Ct. 1175, 1178-79, __ L. Ed. 2d __, 2010 WL 596513, *3 (February 22, 2010).

"This is not to say that the 'absence of serious injury' is irrelevant to the Eighth Amendment inquiry." Id. at 1178 (citing Hudson, 503 U.S. at 7). "[T]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." Id. (quoting Whitley, 475 U.S. at 321).

In the present action, there are no allegations of torture designed to inflict extreme pain without leaving tangible injury or conduct that otherwise is so egregious that one could

29

reasonably call it repugnant to the conscience of mankind. Therefore, if Plaintiff suffered only *de minimis* injuries, that would be an important factor in determining whether more than *de minimis* force was used.

Plaintiff's health record indicates that he suffered a one inch laceration over his right eye, a one-fourth inch laceration on the left side of his forehead, small abrasions on his knees, a small cut in his left ear, a small cut behind his left ear, and a small cut in the corner of his right eye. A large swollen area was also observed under Plaintiff's right eye. (Doc. 16, Ex. K at 16). Plaintiff denied any loss of consciousness. (<u>Id.</u>). Treatment consisted of cleansing Plaintiff's wounds, and applying steri-strips to two of the lacerations. (<u>Id.</u>). Motrin was given to Plaintiff for pain. Following his examination in Fountain's Healthcare Unit, Plaintiff was transported to a local hospital where he was administered numerous tests and x-rays, reflecting no broken bones or additional injuries. (<u>Id.</u>, Ex. M).

In his Complaint, Plaintiff makes no allegations of any significant, lasting ill effects from the altercation, nor does he claim that he ever requested additional medical treatment for his minor injuries. (Doc. 1). Indeed, the record in this action is devoid of evidence of lasting injury to Plaintiff resulting from any altercation.

While the Court is aware that, even in the absence of serious or significant injury, a plaintiff can establish a

30

constitutional claim based on excessive force, Defendant

Rothchild's actions in this case, as described by Plaintiff, do

not involve diabolic or inhuman torture designed to inflict

extreme pain without leaving any mark or tangible injury, nor are

they otherwise so egregious that one could reasonably call them

repugnant to the conscience of mankind.[10]

---

[10]In determining whether the extent of Plaintiff's alleged injuries indicates the use of excessive force, the Court finds instructive the types of injuries which have been held to be insufficient to support excessive force claims under the Eighth Amendment, such as: a scratch on inmate's side from a correctional officer pushing, shoving, and hitting him in an effort to force inmate to comply with an order to pick up his hoe and get back to work, <u>Walker v. Thames</u>, 2001 WL 394911, * 6 (S.D. Ala. 2001) (unpublished); scratches on plaintiff's elbow, bump and one-half inch skin tear behind the ear, abrasion on the shoulder, and jaw pain from correctional officer pushing plaintiff into a glass window while taking him to a holding cell, <u>Lanier v. Fralick</u>, 2000 WL 1844679, *1-2, 5-6 (S.D. Ala. 2000) (unpublished); blow to the forehead with a baton, resulting in no bruising or swelling, <u>Clark</u>, 2000 WL 1568337, *18-19; a sore, bruised ear lasting three days, <u>Siglar v. Hightower</u>, 112 F.3d 191, 193 (5th Cir. 1997); bruises on a prisoner's back from being shoved into a door frame, <u>DeWalt v. Carter</u>, 224 F.3d 607, 620 (7th Cir. 2000); lacerations, bruises, cuts, and swelling as a result of a guard hitting plaintiff's hand with a plastic box when plaintiff reached through a trap in the door of his cell, <u>White v. Matti</u>, 58 Fed. Appx. 636, 638 (7th Cir. 2002) (unpublished); pain, swelling, and bruising from a guard closing a cuffport door on a prisoner's hand, <u>Outlaw v. Newkirk</u>, 259 F.3d 833, 839-40 (7th Cir. 2001); a bruised shoulder from being shoved into a wall, <u>Markiewicz v. Washington</u>, 175 F.3d 1020, *1 (7th Cir. 1999) (unpublished); a 1.5 inch scratch on the back of the hand from handcuffs, <u>Schoka v. Swinney</u>, 53 F.3d 340, *1 (9th Cir. 1995) (unpublished); and daily headaches, not requiring treatment, from being hit with a water bucket, <u>Lunsford v. Bennett</u>, 17 F.3d 1574, 1582 (7th Cir. 1994).

On the other hand, the following types of injuries have been held to be sufficient to support excessive force claims: injury to an inmate's back from guards snapping inmate's head back with a towel, slapping inmate twice in the face, and kicking inmate, <u>Harris v. Chapman</u>, 97 F.3d 499, 506 (11th Cir. 1996); cuts, scrapes and contusions to the face, head, and body from a group beating, <u>Gomez v. Chandler</u>, 163 F.3d 921, 924-25 (5th Cir. 1999);

Assuming, as Plaintiff alleges, that he was beaten by Officer Rothchild in G-Dorm, his injuries were *de minimis* and simply do not support his claim that he was subjected to anything other than *de minimis* force, which in this instance, considering all other factors, is insufficient to establish a constitutional violation under the Eighth Amendment. In light of the undisputed altercation between Plaintiff and Officer Rothchild, Plaintiff's injuries are certainly consistent with the necessary use of restrained force by Defendant, not force "grossly disproportionate to the severity of the offense." <u>Ort,</u> 813 F.2d at 321.

### 2. <u>Hallway Altercation</u>

The second altercation on which Plaintiff is basing his excessive force claim occurred in the main hallway, while Plaintiff was being escorted to the Healthcare Unit. Captain Smith ordered Officer McCorvey to escort Plaintiff to the Healthcare Unit following the altercation between Plaintiff and Officer Rothchild in G-Dorm. (Doc. 16, Ex. A at 3, Ex. D at 4, Ex. G at 2). The evidence in the record consistently and clearly reflects that Plaintiff was escorted without handcuffs because of the number of inmates out in the hallway. (Doc. 16, Ex. A at 4, Ex. B at 4, Ex. D at 4, Ex. G at 3, Ex. H at 2, Ex. I at 2, Ex. J at 2).

Further, the record reflects that once Officer McCorvey

---

a broken finger, <u>Escobar v. Zavaras</u>, 149 F.3d 1190, *3 (10th Cir. 1998) (unpublished); and permanent scarring and numbness from handcuffs, <u>Davidson v. Flynn</u>, 32 F.3d 27, 29 n.1 (2d Cir. 1994).

escorted Plaintiff from the shift office into the hallway, Plaintiff broke away from McCorvey, thus beginning the second altercation of the evening. (Doc. 16, Ex. A at 4, Ex. D at 4, Ex. E at 1, Ex. G at 2). Officer McCorvey began attempting to restrain Plaintiff, who was angry and yelling threats, specifically stating "I'm was tired of this shit, I'm going to start killing y'all motherfuckers." (Doc. 16, Ex. G at 2). Lieutenant Lane, Captain Smith, Officer Rothchild, Officer Madison, Officer Brown, Officer Sykes, Officer Murphy, and Officer Johnson each had to assist in restraining Plaintiff and the officers and calming the situation. Plaintiff was then escorted by Lieutenant Lane and Officer Murphy to the Healthcare Unit, where Plaintiff continued to yell and curse, and continued to be violent even while the medical staff began his examination. (Doc. 16, Exs. B, M). Plaintiff's allegation that the officers "jumped" him for no reason is simply not supported by the record.

Again, in assessing the factors to determine whether actions by Defendants Rothchild and Lane as well as other involved officers violated Plaintiff's right against cruel and unusual punishment, the Court looks first to the threat reasonably perceived by the officers. The record reflects that Plaintiff was being escorted to the Healthcare Unit, without handcuffs, down a hallway populated with inmates. (Doc. 16, Exs. A, B, D, G, H, I, J). Further, it is undisputed that Plaintiff had been, and was continuing to yell obscenities and threats against the officers. (Doc. 16, Exs. A, B, D, G). According to Officer

Corey Sykes, he heard a "loud commotion in the hallway." (Doc. 16, Ex. F at 1). The evidence reflects that Plaintiff pulled away from Officer McCorvey, creating a dangerous situation for the officers and inmates as well. As a result of Plaintiff's disruptive and threatening behavior, there was a need for force by the officers to gain control of and end what was clearly a chaotic and dangerous situation in the main hallway of Fountain.

Specifically regarding Defendant Rothchild's involvement in the hallway altercation, Rothchild averred that he left the shift office to help restrain Plaintiff when he witnessed Plaintiff pull away from Officer McCorvey. (Doc. 16, Ex. A at 4). Officer Rothchild admits that he attempted to kick Plaintiff when Rothchild witnessed Plaintiff begin to rise up as if he was about to charge Captain Smith, who had been forced to the floor during the struggle. (Id.). However, there has been no indication that Defendant Rothchild's motive in attempting to restrain Plaintiff was anything other than a good faith effort to end Plaintiff's disruptive and violent outburst and restore discipline and control.

Moreover, Plaintiff's injuries do not reflect excessive force administered maliciously and sadistically. Plaintiff's minor injuries are more indicative of subdued force, force necessary only to end the chaotic altercation. The Court is mindful that prison officials must be extended deference "in acting to insure the proper administration, safety and security of a penal institution." Ort v. White, 813 F.2d 318, 322 (11th

34

Cir. 1987). Additionally, the Court "examine(s) the facts as reasonably perceived by [Rothchild] on the basis of the facts known to him at the time." Fennell v. Gilstrap, 559 F.3d 1212, 1217 (11th Cir. 2009).

With these considerations in mind, the Court finds that the force used by Defendant Rothchild in attempting to restrain Plaintiff was applied for the purpose of restoring order and was not, in any event, excessive. The actions of Defendant Rothchild, Defendant Lane, and the other officers ended a threatening situation, which notably, was a danger to all officers and inmates in the area, and to Plaintiff himself.

Moreover, following his restraint, the record clearly reflects that Plaintiff was escorted straight to the Healthcare Unit, where he was examined and treated, and then further transferred to the Atmore Community Hospital for x-rays and additional examination. The fact that medical treatment was immediately given, which Plaintiff does not dispute, "'temper[ed] the severity of [the] forceful response,' and makes it less likely that [the defendants were] acting sadistically instead of in good faith." Cockrell v.Sparks, 510 F.3d 1307, 1313 (11th Cir. 2007) (internal citation omitted).

As the United States Supreme Court recently noted, "the extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." Wilkins v. Gaddy, __ U.S. __, 130 S. Ct. 1175, 1178-79, __ L. Ed. 2d __, 2010 WL

596513, *3 (February 22, 2010).  Although Plaintiff suffered a
few initial cuts and bruises, Plaintiff has made no allegations
of any significant, lasting ill effects from the altercation.
(Doc. 1).  Indeed, the record in this action is devoid of
evidence of lasting injury to Plaintiff resulting from any
altercation.

Assuming, as Plaintiff alleges, that he was "jumped on" by
officers in the hallway, his injuries were *de minimis* and simply
do not support his claim that he was subjected to anything other
than *de minimis* force, which in this instance, considering all
other factors including the need to restore order and control, is
insufficient to establish a constitutional violation under the
Eighth Amendment.  In light of the altercation between Plaintiff
and the officers when Plaintiff pulled away from Officer McCorvey
in the hallway, Plaintiff's minor injuries are certainly
consistent with the necessary use of restrained force by
Defendants, not force "grossly disproportionate to the severity
of the offense."  Ort, 813 F.2d at 321.

There is no support in the record for Plaintiff's allegation
that he was unjustifiedly attacked by the various officers,
including Defendant Rothchild, during the altercation in either
the G-Dorm or the hallway.  To the contrary, the evidence
reflects a dangerous, chaotic situation provoked by Plaintiff,
who in the words of his own fellow inmate "has a quick and
violent temper."  (Doc. 20 at 4).

Regarding Defendant Steven Lane, Plaintiff does not contend

that Lane was physically involved in the altercation, but instead that the lieutenant stood and watched, instructing the officers to hit Plaintiff. (Doc. 1 at 9). However, after reviewing all of the documents in the record, including the incident report, disciplinary charge, ADOC investigatory report, witness statements, and each of the affidavits filed by the security staff involved in this altercation, the Court is of the opinion that the evidence does not support Plaintiff's allegation.

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). The court may disregard "visible fiction" where the opposing party's "version of events is so utterly discredited by the record that no reasonable jury could have believed him." Id. at 380-381.

Furthermore, Plaintiff has failed to show a constitutional violation regarding the altercations, both in G-Dorm and the hallway, therefore, Plaintiff's claim against Lieutenant Lane, even if believable, would fail. Plaintiff's Eighth Amendment claims fail as a matter of law.

B. Due Process

Plaintiff also contends that his Fourteenth Amendment right to due process has been violated. (Doc. 1 at 9-10). As a result of the altercation with Officer Rothchild in G-Dorm, Plaintiff

37

was charged with Assault on DOC, and Plaintiff requested that Captain Smith appear as a witness on his behalf. (Doc. 16, Ex. L at 1). Defendant Officer James English conducted the hearing on October 7, 2008, but Plaintiff refused to attend. (Id. at 1-4). Although Plaintiff complains that he refused to attend because his witness, Captain Smith, was not present, the Court notes to the contrary that Captain Smith was present at the hearing, and that she testified that she had no knowledge of the altercation between Officer Rothchild and Plaintiff, as she was not present at that time. (Id. at 3). Plaintiff was found guilty of the charge, and was given 45 days disciplinary segregation and 45 days loss of store, phone and visitation privileges. (Id. at 2).

In order to assert a Fourteenth Amendment due process claim, Plaintiff must have been deprived of "life, liberty, or property." Wolff v. McDonnell, 418 U.S. 539, 556 (1974); U.S. Const. amend. XIV, § 1 (providing, in part: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law..."). In this action, the Court assumes that Plaintiff is alleging a loss of liberty as a result of confinement to disciplinary segregation.

However, an inmate must have a protected liberty interest in order for due process to attach. Gray v. Board of Regents of Univ. System of Ga., 150 F.3d 1347 (11th Cir. 1998). Whether a prisoner has a liberty interest in receiving due process when he is disciplined or has a change in his housing is governed by the

38

Supreme Court's decision in <u>Sandin v. Conner</u>, 515 U.S. 472, 487 (1995). The <u>Sandin</u> Court held that there is no right inherent in the Constitution, nor is there a state-created liberty interest, to be free from disciplinary segregation. The Court found that placement in disciplinary segregation as a form of punishment was not a "dramatic departure" from the ordinary conditions of incarceration and "did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." <u>Id.</u> at 485-86. The Court determined that mere confinement to disciplinary segregation was a type of discipline that should be expected by an inmate as an incident to his criminal sentence. <u>Id.</u>

Thus, under <u>Sandin</u>, Plaintiff has no protected liberty interest regarding his 45 days of disciplinary segregation. <u>Id.</u> Therefore, Plaintiff's due process claim fails as a matter of law.

<u>IV.  CONCLUSION</u>

If a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial," Rule 56(c) mandates that summary judgment be entered against the nonmovant. <u>Celotex Corp.</u>, 477 U.S. at 322. "No material issues can be in dispute where the plaintiff's evidence fails to establish a constitutional violation." <u>Bennett v. Parker</u>, 898 F.2d 1530, 1534 (11th Cir. 1990). Therefore, since no

39

constitutional violation has been established, Defendants' Motion for Summary Judgment is due to be granted.

Based on the foregoing, it is recommended that the Motion for Summary Judgment of Defendants Correctional Officer Kerry Rothchild, Lieutenant Steven Lane, and Lieutenant James English be granted (Docs. 15, 16), that Plaintiff's action be dismissed with prejudice, and that judgment be entered in favor of Defendants on all claims.

MAGISTRATE JUDGE' S EXPLANATION OF PROCEDURAL RIGHTS
AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
<u>AND FINDINGS CONCERNING NEED FOR TRANSCRIPT</u>

1.  **Objection**.  Any party who objects to this recommendation or anything in it must, within fourteen days of the date of service of this document, file specific written objections with the clerk of court.  Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge. *See* 28 U.S.C. § 636(b)(1)(c); *Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. Unit B, 1982)(*en banc*).  The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten[11] days after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection. The objecting party shall submit to the district judge, at the

---

[11] Effective December 1, 2009, the time for filing written objections was extended to "14 days after being served with a copy of the recommended disposition[.]"  Fed. R. Civ. P. 72(b)(2).

time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made. It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection. Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2. **Transcript (applicable where proceedings tape recorded)**. Pursuant to 28 U.S.C. § 1915 and Fed. R. Civ. P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review. Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

DONE this 26th day of May, 2010.

s/BERT W. MILLING, JR.
UNITED STATES MAGISTRATE JUDGE